**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; SIERRA CLUB; PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY; DESERT SURVIVORS, <br>     *Plaintiffs-Appellants*, <br><br> v. <br><br> BUREAU OF LAND MANAGEMENT; U.S. FISH & WILDLIFE SERVICE, <br>     *Defendants-Appellees*, <br><br> and <br><br> BLUERIBBON COALITION; CALIFORNIA ASSOCIATION OF 4 WHEEL DRIVE CLUBS; SAN DIEGO OFF ROAD COALITION; DESERT VIPERS MOTORCYCLE CLUB; HIGH DESERT MULTIPLE USE COALITION; AMERICAN MOTORCYCLE ASSOCIATION, DISTRICT 37; OFF-ROAD BUSINESS ASSOCIATION; CALIFORNIA OFF-ROAD VEHICLE ASSOCIATION; AMERICAN SAND ASSOCIATION, <br>   *Intervenor-Defendants-Appellees*. | No. 14-15836 <br><br> D.C. No. 3:03-cv-02509-SI <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Susan Illston, Senior District Judge, Presiding

Argued and Submitted April 14, 2016
San Francisco, California

Filed August 15, 2016

Before: Diarmuid F. O'Scannlain, Richard R. Clifton,
and N. Randy Smith, Circuit Judges.

Opinion by Judge O'Scannlain

## SUMMARY[*]

### Environmental Law

The panel affirmed the district court's judgment in favor of the Bureau of Land Management ("BLM") in an action by plaintiff environmental groups challenging BLM's proposal to expand access for off-road vehicle recreation in the Imperial Sand Dunes Special Recreation Management Area in Imperial County, California.

The Dunes contain a species of plant known as the Peirson's milkvetch that is categorized as a "threatened species" under the Endangered Species Act. In 2013, BLM adopted a new Recreation Area Management Plan under

_____

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

which a tract would remain closed to off-road vehicle use, as would 9,261 acres of milkvetch critical habitat, and the remainder of the Dunes would be open to off-road vehicle use. Pursuant to section 7(a)(2) of the Endangered Species Act, BLM consulted with the United States Fish and Wildlife Service, which issued a Biological Opinion finding that the 2013 Recreation Area Management Plan was not likely to jeopardize the continued existence of the milkvetch or the desert tortoise.

The panel held that the Endangered Species Act did not require the Biological Opinion to contain Incidental Take Statements for threatened plants, such as the milkvetch.

The panel rejected plaintiffs' claims that BLM's decision to open additional land to off-road vehicle use violated the Clean Air Act, the Federal Land Policy and Management Act, the National Environmental Policy Act, and the Administrative Procedure Act. The panel held that the BLM did not act arbitrarily or capriciously when it relied on air quality analysis demonstrating that emissions resulting from visitors to the Dunes would not be increased impermissibly by the land openings.

---

**COUNSEL**

Brendan R. Cummings (argued), Center for Biological Diversity, Joshua Tree, California; Sarah Uhlemann, Center for Biological Diversity, Seattle, Washington; for Plaintiffs-Appellants.

Brian C. Toth (argued), Norman L. Rave, Jr., and Kevin W. McArdle, Attorneys; Sam Hirsch, Acting Assistant Attorney

General; Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.; Cheryll Dobson and Erica Niebauer, United States Department of the Interior, Office of the Solicitor; for Defendants-Appellees.

David P. Hubbard (argued), Gatzke Dillon & Ballance LLP, Carlsbad, California; Paul A. Turcke (argued), Moore Smith Buxton & Turcke, Boise, Idaho; Dennis L. Porter, Sacramento, California; for Intervenors-Defendants-Appellees.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether the United States Fish and Wildlife Service, in reviewing the Bureau of Land Management's proposal to expand access for off-road vehicle recreation in the Imperial Sand Dunes Special Recreation Management Area, has complied with the requirements of the Endangered Species Act.

I

Just north of the Mexican border, in Imperial County, California, lies the Imperial Sand Dunes Planning Area, a 227,000-acre tract of desert, 214,930 acres of which is managed by the Bureau of Land Management ("BLM"). The expanse is home to the Algodones Dunes, the largest active sand dune system in the United States. A 138,111-acre portion of the Planning Area, designated as the Imperial Sand Dunes Special Recreation Management Area, is set aside for the protection of plants and wildlife, as well as for outdoor

recreation. The Dunes consistently attract well over one million visitors annually, particularly off-road vehicle enthusiasts who flock to the area to take advantage of the unique terrain and beautiful landscape.[1]

The current litigation, which has been ongoing for over a decade, originates from BLM's decision to reopen land within the Imperial Sand Dunes Special Recreation Management Area to off-road vehicle use. The Dunes contain a species of purple-flowered plant known as the Peirson's milkvetch (*Astragalus magdalenae var. peirsonii*), categorized as a "threatened species" for purposes of the Endangered Species Act. *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 422 F. Supp. 2d 1115, 1124–25 (N.D. Cal. 2006). In 2000, the Center for Biological Diversity ("the Center") sued BLM, claiming that it had violated the Endangered Species Act by failing to enter into formal consultation with the Fish and Wildlife Service before adopting a management plan for the Dunes. *Id.* at 1123. As a result, BLM agreed to close temporarily portions of the Dunes to off-road vehicles until it could implement a new Recreation Area Management Plan ("RAMP"). *Id.* at 1124. In 2005, the Center successfully challenged a BLM plan to reopen the closed areas. *Id.* at 1121. The District Court for the Northern District of California at that time held, inter alia, that the Fish and Wildlife Service's "Biological Opinion" for a 2003 BLM RAMP violated the Endangered Species Act in several respects relating to its evaluation of the potential impact on the Peirson's milkvetch and the desert tortoise, another threatened species. *Id.* at 1121–22.

---

[1] A 26,098-acre tract within the Planning Area, known as the North Algodones Dunes Wilderness, is permanently off-limits to off-road vehicle recreation.

In response to the court's order, the Fish and Wildlife Service issued a new critical habitat designation for the milkvetch in 2008, which the Center unsuccessfully challenged. In 2013, BLM adopted a new RAMP. Under the new plan, the 26,098-acre North Algodones Dunes Wilderness tract would remain closed to off-road vehicles, as would 9,261 acres of milkvetch critical habitat. The remainder of the Imperial Sand Dunes Special Recreation Management Area—over 127,000 acres—would be open to off-road vehicle use. BLM additionally prepared an Environmental Impact Statement analyzing the 2013 RAMP, and consulted with the Fish and Wildlife Service pursuant to section 7(a)(2) of the Endangered Species Act. As a result, the Fish and Wildlife Service issued a new Biological Opinion finding that the 2013 RAMP was not likely to jeopardize the continued existence of the milkvetch or desert tortoise.

The Center once again mounted a challenge, asserting various claims under the Endangered Species Act, 16 U.S.C. §§ 1531 et seq., the Clean Air Act, 42 U.S.C. §§ 7401 et seq., the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701–1785, the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq., and the Administrative Procedure Act, 5 U.S.C. §§ 706 et seq. Specifically, the Center alleged that: 1) the 2012 Biological Opinion was deficient because it did not include an Incidental Take Statement for the Peirson's milkvetch; 2) the Fish and Wildlife Service had unreasonably delayed issuance of a recovery plan for the Peirson's milkvetch under section 4(f) of the Endangered Species Act; 3) the 2013 Environmental Impact Statement violated the National Environmental Policy Act by failing to take a "hard look" at impacts on wilderness areas; and 4) BLM violated the Clean Air Act, the Federal Land Policy and Management

Act, the National Environmental Policy Act, and the Administrative Procedure Act by failing to evaluate properly the impacts of the 2013 RAMP on air quality.

The District Court for the Northern District of California granted summary judgment in favor of BLM on all but the second issue.[2]

The Center timely appealed and argues that the plain language of the Endangered Species Act requires an Incidental Take Statement for plants rather than for just fish and wildlife. The Center additionally renews its claim that BLM failed to comply with the Clean Air Act, the Federal Land Policy and Management Act, the National Environmental Policy Act, and the Administrative Procedure Act by failing to evaluate properly the impacts of the 2013 RAMP on air quality.

## II

The Center first avers that the Endangered Species Act requires Fish and Wildlife Service Biological Opinions to contain Incidental Take Statements for threatened plants. In contrast, BLM maintains that Incidental Take Statements are required solely for fish and wildlife.

We review an agency's interpretation of a statute it is charged with administering under the two-step framework set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 902 (9th Cir. 2012). We

---

[2] BLM does not challenge on appeal the district court's disposition of this issue in favor of the Center.

must first determine whether "Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43. "[I]f the statute is silent or ambiguous with respect to the specific issue," however, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. "If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Ctr. for Biological Diversity*, 695 F.3d at 902 (quoting *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005)).

A

Enacted in 1973, the Endangered Species Act authorizes the Secretary of the Interior to designate certain species as "endangered" or "threatened." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 690 (1995). Section 9(a)(1) of the Act provides, among others, the following protection for species so designated: "[W]ith respect to any endangered species of fish or wildlife listed pursuant to section 1533 of this title it is unlawful for any person subject to the jurisdiction of the United States to . . . take any such species within the United States or the territorial sea of the United States." 16 U.S.C. § 1538(a)(1)(B). The Act defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Section 9(a)(2) lists separate protections for

endangered or threatened plants, but notably does not use the term "take." *See* 16 U.S.C. § 1538(a)(2).

In 1978, Congress added a provision to the Act requiring federal agencies wishing to engage in action that may adversely affect an endangered or threatened species to consult first with the Secretary of the Interior to "insure that any action authorized, funded, or carried out by such agency . . . does not jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." Pub. L. 95-632, § 3, 92 Stat. 3751, 3752 (codified as amended at 16 U.S.C. § 1536(a)(2)). Consultation results in a "Biological Opinion, summarizing the relevant findings and determining whether the proposed action is likely to jeopardize the continued existence of the species." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1239 (9th Cir. 2001) (citing 16 U.S.C. § 1536(b)). In 1982, Congress amended section 7 (as well as section 10) of the Act, adding provisions governing "incidental taking," which are takings that are "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." *See* Pub. L. 97-304, §§ 4(a), 6(1), 96 Stat. 1411, 1418, 1422 to 1423; *Sweet Home*, 515 U.S. at 729. Under the amended version of section 7, the Fish and Wildlife Service "must issue an Incidental Take Statement if the [Biological Opinion] concludes no jeopardy to listed species or adverse modification of critical habitat will result from the proposed action, but the action is likely to result in incidental takings." *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1036 (9th Cir. 2007). The statute requires BLM to issue an "Incidental Take Statement" that:

(i) specifies the impact of such incidental taking on the species,

(ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

(iii)    in the case of marine mammals, specifies those measures that are necessary to comply with section 1371(a)(5) of this title with regard to such taking, and

(iv)    sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

16 U.S.C. § 1536(b)(4)(C).

Here, though the Fish and Wildlife Service's 2012 Biological Opinion found that off-road vehicle use "could result in direct death or injury of Peirson's milk-vetch due to crushing, uprooting, or burial of plants and seeds, and by reducing reproductive output of those that survive," the Service did not issue an Incidental Take Statement for the plant.

B

The Center argues that the plain language of section 7's Incidental Take Statement provision requires Incidental Take

Statements for both plants and animals. As the Center observes, consultation between the Fish and Wildlife Service and BLM is required for "*any* endangered species or threatened *species*." 16 U.S.C. § 1536(a)(2) (emphasis added). This is why the resulting Biological Opinion included an analysis of the impact of off-road vehicles on the milkvetch. Under the statute, when the Fish and Wildlife Service concludes in its Biological Opinion that "the taking of an endangered species or a threatened species incidental to the agency action will not" jeopardize the continued existence of a species, but will nevertheless adversely impact a species, it must issue a statement that "specifies the impact of such incidental taking on the species." 16 U.S.C. § 1536(b)(4). The Center contends that the use of the term "species," rather than a different term that might restrict the provision to fish or wildlife, signifies that an Incidental Take Statement is required for *all* species, including plants.

When one reads section 7 in isolation, the Center's argument seems plausible. Indeed, there is nothing specifically in that provision to indicate that Congress intended to limit the term "species" to fish or wildlife. Section 7, however, "must be read in [its] context and with a view to [its] place in the overall statutory scheme," *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)), because an act should "be interpreted as a symmetrical and coherent regulatory scheme, one in which the operative words have a consistent meaning throughout," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995).

Here, context matters. Section 9 prohibits the taking of "fish or wildlife" only:

> [W]ith respect to any endangered species of fish or wildlife listed pursuant to section 1533 of this title it is unlawful for any person . . . to . . . take any such species within the United States or the territorial sea of the United States [or] take any such species upon the high seas.

16 U.S.C. § 1538(a)(1). Section 9(a)(2) contains separate protections for plants, but does not use the term "take." *See* 16 U.S.C. § 1538(a)(2). Section 9 thus demonstrates that when Congress uses the word "take," it means to describe an adverse action against animals, not plants. And, as the district court noted, unlike the section 9(a)(1) protections for "fish or wildlife," the section 9(a)(2) prohibitions relating to plants require "deliberate or malicious conduct." Incidental takings, by definition, are not deliberate. Given that one cannot be held liable for the taking of a plant, it is difficult to conceive how an incidental take "safe harbor" would be necessary for plants.

The Center counters that the Endangered Species Act defines "take" in a manner that does not exclude plants. Under the definitions section of the Act, "[t]he term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). According to the Center, the definition "does not distinguish between animals and plants . . . . It defines only the *act*, not the victim or the crime." As the district court noted, however, the take definition in the statute was part of the original Act. Before the 1982 amendments adding the incidental take provisions of sections 7 and 10, section 9 contained the only provision in which the term "take" was used, and there it was unquestionably limited

to animals—to "fish or wildlife." In drafting the take definition, Congress necessarily had exclusively "fish or wildlife" in mind because those were the only categories of species at the time protected from takings.

Putting the history of the Act aside for a moment, the text of the take definition supports the same conclusion. The majority of the words on the list most naturally describe actions that cannot be directed against plants. For example, one does not *pursue* a tree; one does not typically *shoot* a shrub. *See* 16 U.S.C. § 1532(19). Conversely, there are no words in the definition that could be applied exclusively to plants, such as "uproot." *See id.* The principle of *noscitur a sociis* here guides our reading: "That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well." *Beecham v. United States*, 511 U.S. 368, 371 (1994). Words such as "harm" or "collect," though ordinarily applicable to actions taken against both animals and plants, are best construed in a manner similar to those words that surround them—namely, words describing conduct affecting animals.

Our decision in *Arizona Cattle Growers' Association* lends further support to the proposition that "take" applies to animals only. In that case, we held that the Fish and Wildlife Service acted arbitrarily and capriciously when it issued an Incidental Take Statement "where there either was no evidence that the endangered species existed on the land or no evidence that a take would occur if the permit were issued." *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1233. In reaching our conclusion, we reasoned that section 7's incidental take provision was in essence a "safe harbor" for section 9; if an approved activity might incidentally result in a taking, those engaging in the activity need not fear section 9 liability so

long as they comply with the terms of the Fish and Wildlife Service's Incidental Take Statement. *Id.* at 1239–40. Because there can be no incidental taking if there is no threat of a section 9 taking, there necessarily is only "one standard for 'taking' within both Section 7(b)(4) . . . and Section 9." *Id.* at 1239. Consequently, we "reject[ed] the argument that 'taking' should be applied differently" between the two sections. *Id.* at 1240.[3]

The Center parries *Arizona Cattle Growers' Association* with *Center for Biological Diversity v. Salazar*. In *Center for Biological Diversity*, when the Fish and Wildlife Service first listed the polar bear as "threatened," it issued a rule applying most of section 9's protections but excluded the section 9 "take" prohibitions. 695 F.3d at 910. We held that an Incidental Take Statement was nevertheless required. *Id.* As we explained:

> [E]xemption from Section 9 take liability 'is not the sole purpose of the [Incidental Take Statement]. If the amount or extent of taking specified in the [Incidental Take Statement] is exceeded, reinitiation of formal consultation is required . . . . Thus, the [Incidental Take Statement] serves as a check on the agency's

---

[3] Section 10 of the Endangered Species Act (the other incidental take provision) authorizes the Secretary to permit "any taking otherwise prohibited by section 1538(a)(1)(B) [section 9] of this title if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1). That the provision considers an incidental taking to be a subset of the takings referred to in section 9 further supports the Fish and Wildlife Service's contention that Incidental Take Statements exist to protect "fish or wildlife," 16 U.S.C. § 1538(a)(1), not plants.

original decision that the incidental take of listed species resulting from the proposed action will not [jeopardize the continued existence of the species].' [*Nat. Res. Def. Council, Inc. v. Evans*, 279 F. Supp. 2d 1129, 1182 (N.D. Cal. 2003)]. Accordingly, exemption from Section 9 take prohibitions does not negate the separate requirement that the Service 'will provide' an [Incidental Take Statement] along with its [Biological Opinion]. 50 C.F.R. § 402.14(i)(1).

*Id.* at 911 (some alterations in original).

As the district court recognized, one could perceive tension between *Arizona Cattle Growers' Association* and *Center for Biological Diversity*. While *Arizona Cattle Growers' Association* makes clear that there cannot be a section 7 incidental taking where there is no section 9 taking prohibition, *Center for Biological Diversity* divorces section 7's incidental taking statements from section 9 taking prohibitions in holding that the section 7 provision serves a purpose beyond merely removing liability for otherwise prohibited takings. Fully reconciling the two cases, fortunately, is not necessary to resolve the issue at hand. Accepting *Center for Biological Diversity*'s holding that an Incidental Take Statement can be required where taking is not prohibited, the concept of "taking" nevertheless continues to derive its meaning from section 9 and the Act's definition of "take." To understand what it means to *incidentally take* a species, one must understand what it means to *take* a species; to understand what it means to take, one necessarily looks to section 9. Because section 9 applies to animals only, it

follows that one can neither "take" nor "incidentally take" a plant.

It is no wonder then that district courts have assumed that the incidental take provisions apply to animals only. *See, e.g.*, *Cal. Native Plant Soc'y v. Norton*, No. 01CV1742 DMS (JMA), 2004 WL 1118537, at *8 (S.D. Cal. Feb. 10, 2004) ("In the absence of a prohibition on the 'take' of plant species, Defendants are correct that 'such take cannot occur, and no incidental take statement is needed.'"); *N. Cal. River Watch v. Wilcox*, 547 F. Supp. 2d 1071, 1075 (N.D. Cal. 2008), *aff'd*, 633 F.3d 766 (9th Cir. 2010) ("[S]ection 10—allowing a private party to apply for an incidental take permit—applies only to fish and wildlife; there is no section 10 incidental take permit provision for endangered plants.").

C

Read in context, the text of the statute is clear: the Endangered Species Act does not require Biological Opinions to contain Incidental Take Statements for threatened plants. We therefore need not consider separately the Fish and Wildlife Service's interpretation of the statute. *See Chevron*, 467 U.S. at 842–43. Nonetheless, our reading of the law is consistent with the Service's longstanding interpretation of the incidental take provision not to require the issuance of Incidental Take Statements for threatened plants. *See* Interagency Cooperation—Endangered Species Act of 1973, 51 Fed. Reg. 19926-01, 19935 to 19936 (July 3, 1986) (codified at 51 C.F.R. pt. 402) (defining an incidental taking as a taking that results from activities that violate "the prohibition against taking in section 9 of the Act"); U.S. Fish and Wildlife Service and National Marine Fisheries Service, *Final ESA Section 7 Consultation Handbook* 6–10 (1998)

(stating that an Incidental Take Statement is required as part of formal consultation "except for plant species"). Accordingly, we would have deferred to the agency's reasonable interpretation of the statute and reached the same result had the application of *Chevron* deference been necessary in this case.

## III

The Center next argues that BLM's decision to open additional land to off-road vehicle use violated the Clean Air Act ("CAA"), the Federal Land Policy and Management Act ("FLPMA"), the National Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA"). In reaching its decision, BLM relied on an air quality analysis demonstrating that emissions resulting from visitors to the Dunes would not be increased impermissibly by the openings. We must reject each of the Center's challenges unless we are persuaded that BLM's analysis was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (APA); *see Sierra Club v. U.S. E.P.A.*, 671 F.3d 955, 961 (9th Cir. 2012) (reviewing CAA challenge under APA standard); *Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 994 (9th Cir. 2013) (reviewing FLPMA challenge under APA standard); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 858 (9th Cir. 2005) (reviewing NEPA challenge under APA standard). An agency's analysis is arbitrary and capricious if it has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ranchers Cattlemen Action Legal Fund*

*United Stockgrowers of America v. U.S. Dept. of Agric.*, 499 F.3d 1108, 1115 (9th Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "This standard of review is 'highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision.'" *Id.* (quoting *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000)).

As with the Center's first challenge, we begin with a review of the statutory scheme governing BLM's air quality analysis.

A

1

The CAA was enacted "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). The Act authorizes the Environmental Protection Agency ("EPA") to establish "national ambient air quality standards" for certain designated pollutants. *Id.* § 7407. These pollutants include ozone precursors, such as volatile organic compounds and nitrogen oxides, and particulate matter with a diameter greater than 10 microns ("PM-10"). *See* 40 C.F.R. § 52.21; *see generally* 40 C.F.R. pt. 50. Under the scheme, States are divided into "air quality control regions." *Id.* § 7407. The governor of each State is responsible for designating an area—an entire air quality control region or portion thereof—as "nonattainment" if it fails to meet national ambient air quality standards. *Id.* Nonattainment areas are further classified as "Marginal," "Moderate," "Serious," "Severe," and

"Extreme," based on the severity of pollution present. *Id.* § 7511. The agency must undertake a full "conformity determination . . . for each criteria pollutant or precursor where the total of direct and indirect emissions of the criteria pollutant or precursor in a nonattainment or maintenance area caused by a Federal action would equal or exceed" listed de minimis quantities. 40 C.F.R. § 93.153(b).

In similar fashion, FLPMA requires the Secretary of the Interior, in developing and revising land use plans, to "provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans." 43 U.S.C. § 1712(c)(8).

Finally, before undertaking a proposed action, NEPA requires federal agencies to take a "hard look" to determine the potential impact an agency action may have on the environment; such a review requires a "full and fair discussion of significant environmental impacts." *Western Watersheds Project v. Abbey*, 719 F.3d 1035, 1047 (9th Cir. 2013) (quoting 40 C.F.R. § 1502.1).

2

The Imperial County Air Pollution Control District, which contains the Dunes, is classified as a "moderate" nonattainment area for ozone and a "serious" nonattainment area for PM-10, largely as a result of high winds and particulate matter drifting across the border from nearby Mexicali, Mexico. Under such classifications, BLM would be required to undertake a full conformity determination pursuant to EPA regulation if execution of BLM's 2013 RAMP would result in an increase of 100 tons per year for

ozone emissions or 70 tons per year for PM-10. *See* 40 C.F.R. § 93.153(b). BLM initially concluded in its Draft Environmental Impact Statement that implementation of its preferred plan would increase volatile organic compound emissions by 352 tons per year (generated primarily by vehicle exhaust) and PM-10 emissions by 36,768 tons per year (generated primarily by dust kicked up from vehicles)—both well over the de minimis thresholds that require conformity analyses under 40 C.F.R. § 93.153(b).

Following the issuance of its draft statement for public comment, BLM revised its analysis by changing certain underlying assumptions supporting the initial conclusion that the planned expansion would result in emissions exceeding de minimis quantities. Specifically, BLM changed its assumptions regarding the expected increase in the number of vehicles to the Dunes, the manner in which they would be used, and the amount of dust they might generate. As a result, the Final Environmental Impact Statement concluded that pollution resulting from BLM's planned openings would not increase ozone emissions and would actually *decrease* PM-10 emissions.

B

The Center first argues that the assumptions supporting BLM's ultimate conclusion that implementation of the 2013 RAMP would not increase ozone emissions were arbitrary and capricious. Specifically, the Center takes issue with BLM's assumptions regarding the number of individuals who will visit the Dunes and how an average visitor will spend his time recreating.

1

In its Final Environmental Impact Statement, BLM assumed, for purposes of its emissions analysis, that its plan to open additional areas of the Dunes to off-road vehicle use would not lead to an overall increase in the number of visitors: "[V]isitor use of the Planning Area will remain the same as current levels for all alternatives, and there would be no incremental change in GHG [greenhouse gas] emissions from the baseline." The Center argues that such an assumption cannot possibly be correct—that opening additional areas to off-road vehicle use will necessarily attract an increased number of off-road vehicle enthusiasts.

Yet in litigation surrounding BLM's 2003 RAMP, the Center challenged BLM's contention that the closing of certain areas would result in a decline in visitors. The district court agreed with the Center, concluding that "there is no data in the record linking the interim closures to any reduced OHV [off-highway vehicle] visitation levels at the Dunes." *Ctr. for Biological Diversity*, 422 F. Supp. 2d at 1149. BLM argues that no data has surfaced since the previous litigation demonstrating that opening or closing such areas would change the number of visitors to the Dunes.

Facts and data in the record tend to support the assertion that opening further acreage to off-road vehicle use would not lead to an increased number of visitors. Much of the area scheduled to be opened is quite remote—far from camping and staging areas and lacking in amenities such as restrooms. And fluctuations in the number of visitors appear to be tied more closely to historical trends and economic conditions than to acreage. For example, after previous closures

visitation to the planning area increased initially, before decreasing during a subsequent economic downturn.

BLM's analysis, of course, is not immune from criticism. Of particular note is the inconsistency between BLM's emissions analysis and its economic analysis, the latter of which assumed that opening additional acreage would in fact result in an increased number of visitors. Nevertheless, the existence of such an inconsistency is insufficient proof that the emissions analysis was arbitrary and capricious. Indeed, BLM had the discretion to apply different models and assumptions in different circumstances. *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 610 (9th Cir. 2014) ("[W]e give the [Fish and Wildlife Service] great deference in its choice of scientific tools . . . ."). And, of course, the assumption supporting the economic analysis may simply be wrong—that it differs from the one contained in the emissions analysis does not compel the conclusion that the emissions analysis was flawed.

We are confident that the Center could demonstrate persuasively numerous ways in which BLM's emissions analysis could be improved. Mere differences in opinion, however, are not sufficient grounds for rejecting the analysis of agency experts. *See Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir. 2009). Because BLM's assumptions regarding visitation were supported by substantial evidence, they deserve deference. *See Ursack, Inc. v. Sierra Interagency Black Bear Grp.*, 639 F.3d 949, 958 n.4 (9th Cir. 2011).

2

In addition to criticizing BLM's estimate of the number of expected visitors, the Center attacks BLM's assumptions contained in its Final Environmental Impact Statement relating to how visitors spend their time at the Dunes. Specifically, the Center argues that BLM underestimated the number of hours per day an average rider uses his off-road vehicle, the distance he rides, and the speed at which he travels (the numbers for these variables were significantly higher in BLM's Draft Environmental Impact Statement). As with BLM's prediction of the number of visitors, such assumptions are entitled to deference so long as they are supported by "substantial evidence." *See San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 608.

For purposes of our analysis, however, BLM's revised assumptions regarding vehicle use are irrelevant. A conformity analysis must be prepared only if the emissions *caused by* the federal action—here, BLM's "preferred alternative" in the 2013 RAMP—exceed listed de minimis levels. *See* 40 C.F.R. 93.153(b). BLM applied the same assumptions relating to vehicle use to its preferred alternative as to the baseline conditions against which BLM compared its plan. The Center does not argue that opening more acreage to off-road vehicles would affect the manner in which the average visitor would use his off-road vehicle; it contends instead that BLM's assumptions regarding vehicle use, which apply equally to all proposed alternatives, are wrong. However, as the district court observed, if BLM's assumption that the number of visitors would not increase is correct, the number of hours per day an average rider uses his off-road vehicle, the distance he rides, and the speed at which he travels have absolutely no effect on the calculation of whether

opening additional acreage to off-road vehicles will increase emissions. The same logic undercuts the Center's argument that BLM failed to account for other sources of emissions, such as campfires and generators. Absent an increase in visitation, overall pollution will not change.

C

The Center additionally challenges the "fugitive particulate emissions" (PM-10) portion of BLM's air-quality analysis—specifically BLM's procedure for evaluating the characteristics of the soil found throughout the Dunes. Unlike the assumptions regarding vehicle usage, a change in soil evaluation methods is relevant even if the number of visitors remains constant because soil characteristics vary throughout the Dunes. PM-10 emissions thus depend on which portions of the Dunes are open for off-road vehicle use.

1

Vehicles kick up dust. As a general rule, greater silt content in soil results in greater PM-10 emissions from vehicle traffic. Conversely, when soil contains a greater concentration of sand, PM-10 emissions are reduced. In its original analysis, contained in the Draft Environmental Impact Statement, BLM relied upon "standard assumptions" regarding silt content to determine the amount of airborne PM-10 off-road vehicles operating in the Dunes might produce. After publishing the draft statement, BLM revisited its analysis and "determined the standard assumptions that were used greatly overestimated emissions." BLM was instead persuaded that actual soil samples would provide a better foundation for the analysis and so officials proceeded to test soil throughout the Dunes: "Sites were visited and

approximately 800 gram samples were collected. These samples were returned to the office where they were sieved and weighed to determine the various fractions of silt and sand in the sample." The testing demonstrated that soils on the Dunes were predominantly sand, with over 75 percent of each sample not passing through a mesh screen. Silt content proved to be low, constituting less than 0.5 percent. Such findings, when incorporated into the analysis, yielded a PM-10 figure below the de minimis threshold. Indeed, because BLM's proposed openings would shift off-road vehicle use to areas of the Dunes with lower silt content, and would incorporate proposed mitigation measures, the new analysis predicted a *decrease* in PM-10 emissions from the baseline.

2

Under the CAA, States (and by delegation, local governments) may develop individualized regulatory programs called "state implementation plans" that specify emissions limitations, in addition to other measures designed to satisfy national ambient air quality standards for each pollutant. 42 U.S.C. § 7410. Federal agencies may not "engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan." *Id.* § 7506(c)(1).

The Center argues that the soil sample method employed by BLM was impermissible because it failed to conform to Imperial County's Implementation Plan. Rule 800 of the Implementation Plan, entitled "General Requirements for Control of Fine Particulate Matter (PM-10)," prescribes a method for analyzing soil characteristics. Rule 800, section G.1.e specifically governs the determination of silt content for "Unpaved Roads and Unpaved Vehicle/Equipment Traffic

Areas." The Center avers that because BLM ignored such rule, the results of its analysis are void. BLM counters that the Center's proposed method is used solely to determine whether a road is considered a "stabilized unpaved road" and was therefore inapplicable for BLM's purposes, viz. to estimate PM-10 emissions from off-road vehicle usage.

Rule 800, section G.1.e directs agencies to employ methods contained in appendix B, section C of the Rule to determine the silt content for "Unpaved Roads and Unpaved Vehicle/Equipment Traffic Areas." The appendix explains that the purpose of such methods is "to determine whether an area has a Stabilized Surface." Rule 800, app. B, § A. Indeed, the procedure culminates in a finding as to whether a surface is "stable": "If the average silt loading is less than 0.33 oz/ft$^2$, the surface is STABLE." *Id.* app. B, § C.10 ("Step 9: Examine Results."). As BLM argues, the aim of testing under appendix B, section C, is to determine whether a surface is in fact a "Stabilized Unpaved Road," which Rule 800 defines as "[a]ny Unpaved Road or unpaved vehicle/equipment traffic area surface which meets the definition of Stabilized Surface as determined by the test method." *Id.* § C.38. Rule 800 makes use of the "stabilized unpaved road" standard in section F.5.c, where it requires those overseeing lands on which off-road vehicles are used to employ methods such as watering, paving, or speed restrictions to ensure that a surface does not cease being a "stabilized unpaved road"—that is, to ensure that excessive dust is not generated.

Simply put, a "stabilized unpaved road" under Rule 800 is a *standard*—a surface over which vehicles travel without kicking up excessive amounts of dust; one determines whether the standard is met by using the test prescribed by appendix B, section C. Contrary to the Center's assertion, the

test prescribed by appendix B is not a procedure for gauging PM-10 emissions generally. BLM's use of an alternative method for estimating PM-10 emissions was therefore permissible.

D

Finally, the Center argues that BLM impermissibly disregarded concerns raised by EPA and the Imperial County Air Pollution Control District regarding potential impacts on the environment. We reject this argument for three reasons.

First, ultimate responsibility for ensuring compliance with applicable laws lies with the agency undertaking the proposed action—here, BLM. *See* 42 U.S.C. § 7506(c). Second, that another agency might prefer a different approach is insufficient to demonstrate that BLM acted unreasonably. *See Edwardsen v. U.S. Dep't of Interior*, 268 F.3d 781, 786 (9th Cir. 2001). Third, the record indicates that BLM did indeed consider and respond to criticisms and concerns raised by other agencies, as well as those from the general public. BLM's handling of input from other agencies was therefore neither unlawful nor arbitrary and capricious.

E

In challenging an agency determination such as this, the Center had a steep hill to climb as "[r]eview under the arbitrary and capricious standard is narrow"—a court will not substitute its judgment for that of the agency. *Ecology Ctr.*, 574 F.3d at 656 (internal quotation marks omitted). Here, the record demonstrates that BLM "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Arrington v. Daniels*, 516 F.3d

1106, 1112 (9th Cir. 2008) (quoting *Ranchers Cattlemen Action Legal Fund*, 415 F.3d at 1093). Under the circumstances, the Center has failed to demonstrate that BLM's emissions analysis was arbitrary and capricious under this deferential standard.

## IV

For the foregoing reasons, the decision of the district court is **AFFIRMED**.